[S. F. No. 11579. In Bank.—November 30, 1925.]

## STATE LAND SETTLEMENT BOARD, Petitioner, v. F. R. HENDERSON et al., Respondents.

[1] STATE LAND SETTLEMENT ACT—STATE LANDS—EXEMPTION FROM TAXATION.—All lands held by the state and open for settlement upon the terms prescribed by the State Land Settlement Act (Stats. 1917, p. 1566) are lands which "belong" to the state and are exempt from taxation under the provisions of article XIII, section 1, of the constitution, which provides: "All property in the state except as otherwise in this constitution provided, not exempt under the laws of the United States, shall be taxed in proportion to its value . . . property . . . such as may belong to . . . this state . . . shall be exempt from taxation," and the public character of such lands is not affected by the fact that such lands were once held in private ownership.

[2] ID.—EXEMPTIONS FROM TAXATION—STATUTORY CONSTRUCTION.—The rule that provisions exempting property from taxation are to be strictly construed applies to exemptions of property held in private ownership, but where the question is whether or not public

---

1.   See 24 Cal. Jur. 99; 26 R. C. L. 331.
2.   See 23 Cal. Jur. 806; 24 Cal. Jur. 89; 25 R. C. L. 1093.

property shall be taxed, the rule is that it is not to be taxed unless there is express authority therefor.

[3] ID.—PUBLIC LANDS—PRIVATE INTEREST—TAXATION.—Where land held by the state and open for settlement upon the terms prescribed by the State Land Settlement Act has been sold and is subject to a contract of purchase, the private interest of said purchaser in such land is taxable, but it does not follow that, because the interest of said private person in such lands is taxable, the reversionary interest of the state thereto is taxable.

[4] ID.—INVALID ASSESSMENTS—CANCELLATION—MANDAMUS—PLEADING —JUDGMENT.—In a proceeding in *mandamus* to compel a county board of supervisors and the district attorney of said county to cancel certain assessments on lands held by the state and open for settlement upon the terms prescribed by the State Land Settlement Act, the order of the court cannot be made effective against illegal assessments or sales not alleged by the petitioner to have been made, but must be limited to the illegal assessments specifically alleged to have been made.

(1) 37 Cyc., p. 872, n. 94.   (2) 37 Cyc., p. 872, n. 94.   (3) 37 Cyc., p. 873, n. 98.   (4) 28 C. J., p. 881, n. 10.

PROCEEDING in Mandamus to compel the cancellation of assessments on state lands.  Writ granted.

The facts are stated in the opinion of the court.

U. S. Webb, Attorney-General, and Frank English, Deputy Attorney-General, for Petitioner.

C. H. McCray and F. W. Henderson for Respondents.

SEAWELL, J.—This action arises on a petition for a writ of mandate by the State Land Settlement Board against the board of supervisors and the district attorney of the county of Merced, asking for a writ of mandate commanding said board of supervisors to have entered upon the minutes of its board an order directing the auditor of the county of Merced to cancel certain assessments of taxes levied against the State Land Settlement Board for the fiscal year 1924–25, and likewise directing said respondents, as members of and constituting said board of supervisors, to

3.   See 24 Cal. Jur. 78.

direct the auditor of said county of Merced to cancel any other assessments which may have been levied by the assessor of said county upon any other property situate in said county of Merced and belonging to the state of California and held for and on its behalf by said State Land Settlement Board, as particularly described in said petition; and to likewise command said board of supervisors to direct the auditor and recorder of said county of Merced to cancel any and all assessments of any of the property which may have been sold to the state because of the non-payment by said State Land Settlement Board of any taxes erroneously or illegally levied against said property and said State Land Settlement Board; further, that said writ of mandate do also command the district attorney of said county of Merced to give his written consent to the cancellation and correction (Pol. Code, sec. 3881) herein prayed for and for appropriate relief and costs of suit.

But one question is presented by this proceeding, to wit: whether the lands and property acquired and held by the State Land Settlement Board on behalf of the state and which are needful or necessary to effect the purposes of said act (Stats. 1917, c. 755, p. 1566, amended Stats. 1923, c. 411, p. 930; Stats. 1925, c. 206, p. 358) are subject to taxation. (Const., art. XIII, sec. 1; Pol. Code, sec. 3607.)

The first section of the act is declaratory of the legislative belief in the wholesomeness of the legislation it was undertaking. It is thus stated: "The legislature believes that land settlement is a problem of great importance to the welfare of all the people of the state of California and for that reason through this particular act endeavors to improve the general economic and social conditions of agricultural settlers within the state and of the people of the state in general." By section 2, as amended in 1923 (Stats. 1923, p. 930, sec. 1), the object and scope of the act is thus stated: "The object of this act is to provide employment and rural homes for soldiers, sailors, marines and others who have served with the armed forces of the United States in the European war or other wars of the United States, including former American citizens who served in allied armies against the central powers and have been repatriated, and who have been honorably discharged, to promote closer agricultural settlement, to assist deserving and quali-

fied persons to acquire small improved farms, to demonstrate the value of adequate capital and organized direction in subdividing and preparing agricultural land for settlement, and to provide homes for farm laborers.  To carry out the objects herein stated there is hereby created a state land settlement board to consist of five members appointed by the governor to hold office for a term of four years and until their successors have been appointed and shall have qualified; . . . ''

By section 3, as amended in 1925 (Stats. 1925, p. 358, sec. 1), it is provided that the board shall constitute a body corporate, with the right on behalf of the state to hold property, receive and request donations, to sue and be sued, and all other rights provided by the constitution and laws of the state of California, as belonging to bodies corporate, together with all rights and authority necessary for the proper carrying out of the provisions of the act.

Section 4, as amended in 1923 (Stats. 1923, p. 932, sec. 2), provides that the board may acquire *on behalf of the state,* by purchase, gift, or the exercise of the power of eminent domain, all land, water rights, and other property needed for the purposes of the act, and may take title in trust and shall, without delay, improve, subdivide, and sell such land, water rights, and other property, with appurtenances and rights, to approved *bona fide* settlers.  The powers with which the board is invested by the act are very broad and are too numerous to restate at large.  We will, therefore, make reference to but a few of them.  The board is given authority to set aside for town-site purposes suitable areas purchased under the provisions of the act and to subdivide and sell or lease said lands acquired by it for cash, or on terms, in lots of such size and with such restrictions as to resale as it shall deem best; it may dedicate to public use such areas as it may deem desirable for roads, schoolhouses, churches, or other public purposes.  It is given authority to contract with owners of tracts of land large enough, in the opinion of the board, to provide homes for at least one hundred settlers, such tracts to have a water supply sufficient to irrigate the same.  Under such contracts the board may provide that it shall prepare plans for subdivision, improvement, and sale of the tract contracted for, and in cases where the board is able to make arrangements satisfactory

to it, it may undertake for the owners of the land the settlement and sale of the same under such terms and conditions as it may deem fit, provided said terms and conditions are, in a general way, similar to those as in said act provided. The board is given authority to call upon the University of California for assistance in making soil surveys and other investigations necessary to determine the feasibility of the soil for settlement and in fixing the sale price of land according to productiveness.

Said board is empowered to establish within California or outside the state "offices for meeting settlers and selling the land." Also to "arrange for land seekers' excursions within or without the state." In addition to the many enumerated powers conferred, or attempted to be conferred, upon the board it is given "all additional power and authority the board may deem necessary to enable the board to co-ordinate existing colonizing activities so far as they relate to irrigable areas and to bring to new farming communities the benefit of an organized life. The board shall make such charges in connection with its work under such contracts as will be sufficient to meet all expenses, such charges to be paid out of the funds obtained from the sale of the land."

Section 5 provides for the procedure to be taken when, in the judgment of the board, *private land* should be purchased for settlement in furtherance of the purposes of the act. Before the purchase of any private land may be made an inspector approved by the board must be appointed to inspect the land proposed to be purchased and report to the board as to the productiveness and the value of the same and its adaptability to intensive, closer settlement, including an appraisement of the value of water rights and improvements thereon, and if the board is satisfied as to the reasonableness of the seller's price it shall submit its report and recommendations to the Governor and upon his approval the board shall be authorized to make the purchase, provided that before the purchase is made the attorney-general shall approve the title of such land and any water right appurtenant thereto and the State Water Commission shall certify in writing as to the sufficiency of any water rights to be conveyed.

By section 10 it is provided that all sales and allotments of land made by the board to settlers under said act "shall be made under such terms and conditions as shall give to the board *full control* of any subdivisions thereof until all moneys advanced by the state for the purchase, improvement, or equipment of such subdivisions are fully repaid, together with interest thereon as herein provided." (Italics supplied.) Immediately upon taking possession of any land purchased by the board and after deducting any areas to be set aside for town sites or public purposes, the board shall subdivide said land into areas suitable for farms and farm laborers' allotments, lay out, where necessary, roads, ditches, and drains for giving access to and insuring the proper cultivation of the several farms and allotments. Prior to disposing of any of said land to settlers, or at any time after such land has been disposed of, but not after the end of the fifth year from the commencement of the term of the settler's purchase contract, the board may prepare all or any part of such land for irrigation and cultivation; seed, plant, or fence such land, and cause dwelling-houses and outbuildings to be erected on any farm allotment or make any other improvement necessary to render the allotment habitable and productive in advance of or after settlement, the cost to the board of such dwellings, buildings, and improvements not to exceed fifteen hundred dollars on any one farm allotment; cause cottages to be erected on any farm laborer's allotment and provide a domestic water supply, the combined cost to the board of the cottage and water supply not to exceed eight hundred dollars on any one farm laborer's allotment; make loans to approved settlers on the security of permanent improvements, stock and farm implements, and the total amount of any such loan, together with moneys spent by the board on improvements as above specified, not to exceed three thousand dollars on any one farm allotment, or two thousand dollars on any one farm laborer's allotment. Authority is granted to the board to operate and maintain any irrigation works constructed to conserve any lands purchased and sold under the provisions of the act. All moneys received in tolls and charges for the operation and maintenance of any works or for any water supplied therefrom shall be deposited in the land settlement fund created by the act and shall become available for the

payment of any costs, expenses, or other charges authorized to be paid from said land settlement fund. After the purchase of land by the board and before its disposal to approved *bona fide* applicants, the board shall have authority to lease such land or a part thereof on bonded or secured leases on such terms as it shall deem fit. The act provides in detail for public notice to be given before any part of an area is thrown open for settlement and the mode and amount of payment and such other particulars as the board may deem proper and it shall have the power in its discretion to reject any and all applicants. The board may also sell at public auction, under such conditions of sale and notice thereof as the board may prescribe, any areas which it may determine are not suitable for farm or farm laborer's allotments. Any citizen of the United States, or any person who has declared his intention of becoming a citizen of the United States, and who is not the holder of agricultural lands or of possessory rights thereto to the value of fifteen thousand dollars, and who by his purchase would not become the holder of agricultural land or of possessory rights thereto exceeding such value, and who is prepared to enter within six months upon active occupation of the land acquired, may apply for and become the purchaser of either a farm allotment or a farm laborer's allotment; not more than one allotment shall be sold to any one person. The board may, in offering for sale farm or farm laborer's allotments, co-operate or contract with the duly authorized representatives of the United States government and other public corporations or agencies generally. It is authorized to perform all acts necessary to co-operate fully with the agencies of the United States engaged in work of similar character, and with similar boards and agencies of other states. In its co-operation with such representatives or agencies of the United States government, preference must be given to soldiers, sailors, marines, and others who have served with the armed forces of the United States, including former American citizens who served in allied armies against the central powers, and have been repatriated, and who have been honorably discharged. The board may give such preference to any of such citizens of California, who, as soldiers, sailors, marines, and others, have served with the armed forces of the United States as above described. The

selling prices of the several allotments into which the purchased land may be subdivided shall be fixed by the board in such amounts as are calculated to return to the state the original cost of the land, together with a sufficient sum added thereto to cover all expenses and costs of surveying, improving, subdividing, and selling such lands, including the payment of interest, and all costs of engineering, superintendence, and administration, including the cost of operating any work built, directly chargeable to such land, and also the price of so much land as shall on subdivisions be used for roads and other purposes, and also such sum as shall be deemed necessary to meet unforeseen contingencies; the board may revise such prices in such a manner as to best protect the interest of the state, and may re-offer such allotments for sale at the revised prices so stated. Every approved applicant shall enter into a contract of purchase with the board, which contract shall, among other things, provide that the purchaser shall pay as a cash deposit a sum equal to five per cent of the sale price of the allotment and in addition not less than ten per cent of the cost of any improvement made thereon. The balance due on the land shall be paid in amortizing payments extending over a period to be fixed by the board, not exceeding forty years, together with interest thereon at the rate of five per cent per annum, except as otherwise provided by the act. The amount due on improvements shall be paid in amortized payments extending over a period to be fixed by the board, not exceeding twenty years, together with interest at the rate of five per cent per annum. Provision for the repayment of loans made on livestock or implements is also made. If, after the expiration of six years from the opening date of any colonization project, it shall appear to the board that the contracts made with settlers shall work an undue hardship upon them, and the success of the project, and investment of state funds is thereby jeopardized, the board shall have authority with the consent of the settler to revise such existing land purchase contract by a reduction of not exceeding thirty per cent in the sale price of the land and by a reduction in the rate of interest to be thereafter charged on the land purchased. Every contract entered into between the board and an approved purchaser shall contain provisions that the purchaser shall cultivate

the land in a manner to be approved by the board and shall keep in good order and repair all buildings, fences, and other permanent improvements situated on his allotment, reasonable wear and tear and damage by fire excepted. Each settler shall, if required, insure and keep insured against fire all buildings on his allotment, the policies therefor to be made out in favor of the board and to be in such amount or amounts and in such insurance companies as may be prescribed by the board. In the event of the failure of a settler to comply with any of the terms of his contract of purchase and agreement with the board, the state and the board shall have the right at its option to cancel the said contract of purchase and agreement and thereupon shall be released from all obligation in law or equity to convey the property and the buyer shall forfeit all right thereto and all payments theretofore made shall be deemed to be rental paid for occupancy. The board may require the settler as security and for its protection to execute a mortgage or a deed of trust on the property purchased upon such terms as may appear just. Actual residence on any allotment sold under the act shall commence within six months from the date of the approval of the application and shall continue for at least eight months in each calendar year for at least ten years from the date of approval of said application, unless prevented by illness or some other cause satisfactory to the board. By the amendment of 1919, for the purpose of carrying out the provisions of the act, the sum of one million dollars was appropriated out of any money in the state treasury not otherwise appropriated, which sum of one million dollars, it is calculated, shall be returned to the state within a period of fifty years from the date of said appropriation.

Other provisions of the act not essential to a consideration of the questions presented are omitted.

We have quoted freely from the act, substantially adopting its language, for the reason that it aptly illustrates the completeness of the official control under which the colonization plan has been placed and shows that said lands are treated as state property. The purchase of all lands by the board is made subject to the approval of the Governor of the state and the title thereto must be approved by the attorney-general. The State Water Commission must also

certify to the sufficiency of the water supply. Several public commissions and boards are given advisory powers in the promotion of the general plan. The control and operation of the plan is strictly under the direction of the state's legally constituted agencies. In this respect it does not differ from the many other public institutions or entities of the state which are controlled indirectly by the state through trustees or boards or commissions.

It will be also noted by an examination of the plan and scheme of the act that nothing is said nor is any provision made for the payment of taxes on land owned by the state and not under contracts of purchase. It is not likely that such an important item as the payment of taxes on lands owned by the state would have escaped the attention of the framers of the act in view of the very careful and thoughtful provisions made for the payment by the purchasers of all costs and expenses incidental to sales and for the repayment of all outlay or advancement of moneys made by the state in carrying out the provisions of the act, together with interest, which costs, expenses, and outlays of money are included in the purchase price, to the end that the state may be made whole in the transaction. The fact that taxes are not regarded as an element in computing the price to the purchasers gives support to the theory that it was not the intention of the framers of the act that land acquired and held by the state for the purposes of the act should be subject to taxation. [1] We think that all lands held by the state and open for settlement upon the terms prescribed by the State Land Settlement Act are lands which belong to the state and are exempt from taxation under the provisions of article XIII, section 1, which provides:

"All property in the state except as otherwise in this Constitution provided, not exempt under the laws of the United States, shall be taxed in proportion to its value, to be ascertained as provided by law, or as hereinafter provided . . . property . . . such as may belong to the United States, this state, or to any county, city and county, or municipal corporation within this state shall be exempt from taxation, . . . "

We are unable to perceive why, and no argument of sufficient strength has been made to convince us to the contrary, lands purchased by the board in compliance with the act

should be in a different class, so far as ownership is concerned, than state school lands or other public lands which belong to the state and are open to settlement. The fact that the public lands in question were once held in private ownership cannot affect the public character that such lands take on after purchase by the state for public purposes. If this argument should obtain, none of the lands belonging to the state and devoted to public uses would be exempt from taxation. We have no doubt but that property acquired by the board for the purpose of carrying out the objects of the act belongs to the state within the intent and meaning of the constitutional provision which exempts property from taxation, and that such property is property of the state of California. "The word 'belong' is applied alike and with the same force and meaning to the United States, this state, and to counties and municipalities, and it seems to us was employed to denote an unqualified ownership of the property, not an ownership subject to the condition that it was to be used exclusively for governmental purposes. Certainly it was not intended to attach any such condition to property belonging to the United States or this state, and how can we give it a different meaning as applied to counties and municipalities? 'The constitution of a state derives its force and authority from the vote of the people adopting it. For that reason it is a general rule that in construing the provisions of a constitution the words employed therein shall be given a meaning which they bear in ordinary use among the people. The natural and ordinary meaning of words is to be accepted, except where a word is used the meaning whereof is established by statute or by judicial construction.' (*Burke* v. *Snively,* 208 Ill. 328 [70 N. E. 327, 329].) All the dictionaries give to the word 'belong,' among other meanings, the definition: 'To be the property of' (Webster, Century) ; 'To be possessed by' (Worcester)." (*San Francisco* v. *McGovern,* 28 Cal. App. 491 [152 Pac. 980].) Other examples and illustrations of the meaning of the word "belonging to" are given to show that the words used in a constitution are equivalent to "the property of." The words "belong to" are equivalent to the words "owned by." The primary meaning of the term is "to be the property of." It implies ownership. (7 C. J., 1039, and note.) There is ample authority in this

and other jurisdictions to sustain this construction. Many of the revenue acts of this state would have an uncertain meaning if we were to depart from the evident meaning of the word as used in the state constitution. The constitution places no limitation upon the use that the state shall make of its land. It is not, for the purposes of taxation, restricted to an exclusive use.

[2] The rule that provisions exempting property from taxation are to be strictly construed has no application to this case. In *Pasadena* v. *County of Los Angeles,* 182 Cal. 171 [187 Pac. 418], speaking of the strict construction rule, it is said: "That rule applies to exemptions of property held in private ownership. But where the question is whether or not public property shall be taxed, the rule is that it is not to be taxed unless there is express authority therefor. An example of this is found in the decisions to the effect that property belonging to a city was not taxable under the constitution of 1849, although there was no express exemption thereof in that constitution. (*People* v. *Doe,* 36 Cal. 220.)"

[3] The parcels of land upon which the assessments are sought to be canceled are situate within the Delhi state land settlement and are numbered 256 and 433, respectively. Allotment number 256 has been sold by the board and is subject to a contract of purchase made by it with one N. J. Garrison. "When an interest in land, whether freehold or for years, is severed from the public domain and put into private hands, the natural implication is that it goes there with the ordinary incidents of private property and therefore is subject to be taxed. . . . 'The principle that a possessory right in public land is private property, and that it may be assessed for purposes of taxation to the person in possession, although in point of law he may have no right as against the state or government owning the land, has long been settled in this state.' " (*San Pedro etc. R. R. Co.* v. *Los Angeles,* 180 Cal. 18 [179 Pac. 393].) A private interest in or use of public lands is not exempt from taxation because the interest of the state is nontaxable. It does not follow, however, that because the interest of a private person in public lands is taxable that the reversionary interest of the state thereto is also taxable. (*San Pedro etc. R. R. Co.* v. *Los Angeles, supra.*)

[4]   The prayer of the petition is much broader in its requests for relief than the allegations of the petition would warrant us in granting, in that no assessments are specifically alleged to have been made against any property belonging to the state other than the two allotments described therein. Neither are any sales shown to have been made under void assessments.   Our order cannot be made effective against illegal assessments or sales not alleged by petitioner to have been made.   If such assessments have been made they would fall within the rule herein announced.

Let a peremptory writ of *mandamus* issue directing the cancellation of the assessments of the two allotments of land described in the petition.

Lawlor, J., Waste, J., Shenk, J., Richards, J., and Myers, C. J., concurred.