[No. C008317. Third Dist. Mar. 10, 1992.]

MAYHEW TECH CENTER, PHASE II, Plaintiff and Respondent, v., COUNTY OF SACRAMENTO et al., Defendants and Appellants.

[No. C008963. Third Dist. Mar. 10, 1992.]

THE PEOPLE ex rel. DEPARTMENT OF GENERAL SERVICES, Plaintiff and Appellant, v.
COUNTY OF SACRAMENTO, Defendant and Appellant.

**COUNSEL**

John K. Van de Kamp, Attorney General, James B. Cuneo and Robert D. Milam, Deputy Attorneys General, for Plaintiff and Appellant.

L. B. Elam and Robert A. Ryan, Jr., for Defendants and Appellants.

Diepenbrock, Wulff, Plant & Hannegan, Brian T. Regan, John P. Wagner, Flynn & Stewart, Michael J. Flynn and John E. Cassinat for Plaintiff and Respondent.

## OPINION

**NICHOLSON, J.**—These consolidated cases involve Sacramento County's effort to assess a property tax on land and improvements occupied by California's Franchise Tax Board under a lease-purchase agreement. We conclude the lease-purchase agreement is authorized by statute, does not violate the debt limitation provision of article XVI, section 1 of the California Constitution, and exempts the property from taxation pursuant to article XIII, section 3 of our Constitution.

### FACTS

In 1982, the State of California (the State) issued a request for proposals for construction of a new facility for the Franchise Tax Board in Sacramento. The State accepted the bid of Mayhew Tech Center, Phase II (Mayhew), a general partnership. Under the agreement, (1) a trustee issued certificates of participation to finance acquisition of the property and construction of the facility; (2) Mayhew and the State entered into a long-term lease; (3) the State's rental payments were used to pay the certificate holders; (4) Mayhew transferred its right to receive rental payments to the trustee for the benefit of the certificate holders; (5) Mayhew transferred legal title to the property to ComPlan, Inc. (ComPlan), a Delaware corporation, even though the funds for acquisition of the property came from the proceeds of the sale of certificates; and (6) at the end of the lease, legal title will automatically vest in the State if all rental payments are made.

In order to avoid the necessity of legislative and voter approval under the debt limitation provision of article XVI, section 1 of the California Constitution,[1] the agreement provides the State can unilaterally terminate the lease, without penalty, in the event the Legislature and Governor fail to provide

---

[1] Article XVI, section 1 of the California Constitution states, in pertinent part: "The Legislature shall not, in any manner create any debt . . . which shall . . . exceed the sum of three hundred thousand dollars . . . unless the same shall be authorized by law for some single object or work . . . but no such law shall take effect unless it has been passed by a two-thirds vote of all the members elected to each house of the Legislature and until, at a

funds for a rental payment.[2] In such an event, the State would have no further rights in the property.

The following is a summary of the more important documents effectuating the parties' agreement.

### A. Lease Between Mayhew and State

The State, as lessee, and Mayhew, as lessor, executed a lease on March 1, 1983. The term of the lease runs from March 1, 1983, to January 31, 2006. Rental payments are due every six months, on June 1 and December 1, according to a rental payment schedule attached to the lease. As already noted, the State's obligation to pay rent is conditioned on the appropriation of rental funds by the Legislature and the Governor in each year's budget. Absent such an appropriation, the lease would terminate and the State would have no further rights or title in the property under the lease. The State is responsible for all maintenance and repair on the property during the term of the lease, and any insurance proceeds will be made available to the State for those purposes. The State is responsible for utilities and services provided on the property. The State also agreed to pay any taxes and assessments levied on the property. If at the end of the lease term the State has made all rental payments, title to the property will vest in the State. Finally, the State obtained an option to purchase the property on or after March 1, 1993.

### B. Trust Agreement Between Mayhew and First Interstate Bank

In a trust agreement dated March 1, 1983, between Mayhew, as developer, and First Interstate Bank, as trustee, the parties made financing arrangements. The agreement authorized the trustee to issue certificates of participation in the principal amount of $42,055,000. The certificates represent an undivided ownership interest in the rental payments under the lease between Mayhew and the State. The proceeds of the sale of certificates were applied to several different funds: (1) the costs of issuing the certificates, (2) acquisition of adjacent property, (3) acquisition of the property owned by Mayhew, (4) construction of the facility, and (5) payment of the State's rent until the construction of the facility was completed. The trustee will deliver the grant deed to the State upon completion of rental payments. Should the State default in payment of rent, the trustee may take possession of the

---

general election or at a direct primary, it shall have been submitted to the people and shall have received a majority of all the votes cast for and against it at such election; . . ."

    [2]As have the parties, we will refer to the provision of funds within the usual context of the budgeting and funding processes which are cooperatively pursued by the Legislature and the Governor.

property and sell or lease it. The proceeds of the sale or lease would be applied to pay the certificate holders, and any surplus would be paid to the State.

C. *Assignment Agreement Between Mayhew and First Interstate Bank*

By an agreement dated March 1, 1983, Mayhew assigned to the trustee its right to receive rental payments from the State under the lease.

D. *Site Acquisition Agreement Between Mayhew and ComPlan*

Also on March 1, 1983, Mayhew transferred legal title to the property to ComPlan, subject to all other agreements discussed.

Sacramento County (the County) assessed property taxes on the property for five fiscal years, 1983-1984 through 1987-1988. The taxes were paid as follows:

| FISCAL YEAR | ENTITY WHICH PAID TAX | SUBJECT TO CASE NO. |
|---|---|---|
| 1983-1984 | Mayhew | C008317 |
| 1984-1985 | Mayhew | C008317 |
| 1985-1986 | Mayhew or ComPlan[3] | C008317/C008963 |
| 1986-1987 | ComPlan | C008963 |
| 1987-1988 | State | C008963 |

PROCEDURAL HISTORY

A. *Action by Mayhew and ComPlan, Case No. C008317*

Mayhew and ComPlan brought actions against the County for refund of taxes paid on the property for three fiscal years, 1983-1984 through 1985-1986. The superior court consolidated the two actions, and Mayhew, ComPlan, and the County each moved for summary judgment. The court granted the motion of Mayhew and ComPlan and denied the County's motion, finding the land and improvements were exempt from property tax liability because the State held beneficial ownership of the property. Thus, Mayhew was entitled to a refund for property taxes it paid in each of the three fiscal

---

[3]These two consolidated actions conflict concerning who paid the taxes for fiscal year 1985-1986. The judgment in case No. C008317 states Mayhew paid the taxes, while the County and the State stipulated in case No. C008963 ComPlan paid the taxes. The conflict is not relevant to this appeal. In case No. C008317, to which the State was not a party, the court found Mayhew paid the taxes for the three fiscal years in question and allowed Mayhew to recover taxes for each of those three fiscal years. In case No. C008963, to which Mayhew was not a party, the court found the State did not pay the taxes for the two fiscal years, 1985-1986 and 1986-1987, and disallowed the State's attempt to recover taxes for those two fiscal years. However, the court found the State did pay the taxes for the fiscal year 1987-1988 and allowed the State to recover taxes for that fiscal year.

years 1983-1984 through 1985-1986. Judgment was entered on the order in favor of Mayhew.[4] The County appeals, contending (1) the property was not exempt because the State had nothing more than a leasehold and, thus, did not hold beneficial ownership for tax purposes, (2) if the agreements confer ownership they constitute an installment purchase contract which is unauthorized by statute and violates the debt limitation provision of the California Constitution, and (3) summary judgment was not available because Mayhew failed to respond to the County's affirmative defense ComPlan did not pay the taxes.

B. *Action by State of California, Case No. C008963*

In a separate action, the State filed a complaint against the County for refund of property taxes paid for three fiscal years, 1985-1986 through 1987-1988. Both parties moved for summary judgment or summary adjudication of issues. The superior court denied both motions for summary judgment but granted, in part, the motions for summary adjudication of issues. The court held the State was entitled to a refund for property taxes it paid in fiscal year 1987-1988, but not for fiscal years 1985-1986 and 1986-1987, because the State did not pay the taxes for those years. Judgment was entered, and both parties appeal. The State contends the court improperly denied the refund for the two fiscal years the State did not directly pay the taxes to the County. The County reiterates the arguments it makes in case No. C008317 concerning the propriety of the property tax assessments.

We have consolidated case Nos. C008317 and C008963 for decision.

DISCUSSION

I

*Ownership of the Property for Tax Purposes*

Property owned by the State is exempt from taxation. (Cal. Const., art. XIII, § 3.) ▮▮▮ Arguing this exemption does not apply to the property here at issue, the County contends the agreements create no more than a leasehold in the State, not ownership. "The owner of the legal title to property is presumed to be the owner of the full beneficial title. This presumption may be rebutted only by clear and convincing proof." (Evid.

---

[4]Even though the order granting summary judgment included ComPlan along with Mayhew, the judgment did not. Neither the record on appeal nor the parties explain why ComPlan was not included in the judgment.

Code, § 662.) ■ However, "[a] title clause standing alone is not conclusive of ownership for tax purposes . . . ." (*General Dynamics Corp. v. County of L.A.* (1958) 51 Cal.2d 59, 67 [330 P.2d 794].) To ascertain ownership for tax purposes, the court must examine the terms of the agreements involved and determine who holds "the essential indicia of ownership." (*Ibid.*) ■ Applying this test to the agreements here, we agree with the trial court the State holds the essential indicia of ownership, despite the presence of a lease among the agreements.

Except for the lack of immediate indebtedness for the aggregate installments, the financing arrangement closely resembles the financing of a purchase through a loan secured by a deed of trust on the subject property. Here, the buyers of the certificates of participation provided funds for the purchase of the land and construction of the facility. The rents paid under the lease are for the benefit of the certificate holders, and, in the event of default in paying the rent, the trustee will sell or lease the property to pay off, first, the certificate holders. The remaining funds will go to the State. Mayhew is left without an interest in the property, and the legal title transferred to ComPlan does not include the right to receive the rents, contains no reversionary interest, and will be automatically divested in the event of expiration of the lease or default on the payment of rent. Consequently, most of the property rights are vested in the State, as they would have been in a normal purchase through a loan secured by a deed of trust.

The State holds the exclusive right to occupy and use the facility under the lease. Furthermore, the lease provides for automatic vesting of title in the State at the expiration of the lease if all rental payments are made. Even in the event of default on rental payments, the State would receive the funds remaining after sale of the property and payment of the certificate holders. In other words, any equity in the property belongs to the State. As in a conditional sale setting, the State holds beneficial ownership both in a practical and legal sense because it has possession and use of the property to the complete exclusion of all others, subject only to its own default and the remedies which would result. (See *Sherman v. Quinn* (1948) 31 Cal.2d 661, 663 [192 P.2d 17].) Under a review of essential indicia of ownership, we conclude the State holds beneficial ownership for tax purposes. (*General Dynamics, supra,* 51 Cal.2d at p. 67.)

In so concluding, we find support in an analogous situation which arises when a governmental entity transfers property to a private party. ■ When the state sells property to a private party but retains title for security purposes, the property is no longer tax exempt under the California

Constitution. (*Eisley* v. *Mohan* (1948) 31 Cal.2d 637, 642-643 [192 P.2d 5]; *Los Angeles Dodgers, Inc.* v. *County of Los Angeles* (1967) 256 Cal.App.2d 918, 922-923 [64 Cal.Rptr. 465] [construing former art. XIII, § 1 of the Cal. Const., which provided the state property tax exemption].) " 'Where beneficial interest has passed to a vendee, the retention of legal title does not give a significant difference from the situation of a deed with a lien retained or a mortgage back to secure the purchase money.' " (*Eisley, supra,* at p. 643, quoting *S.R.A., Inc.* v. *Minnesota* (1946) 327 U.S. 558, 569 [90 L.Ed. 851, 860, 66 S.Ct. 749].)

In *Los Angeles Dodgers,* the City of Los Angeles transferred 40 acres of land to the Dodgers in the Chavez Ravine area because the Dodgers agreed to pay to build and maintain recreational facilities. In the event the maintenance of the facilities did not cost $60,000 in any given year, the Dodgers were to pay the difference between the cost of maintenance and $60,000 to the city so the city could use the money to maintain its other recreational facilities. Under the agreements between the city and the Dodgers, the city retained legal title to the 40 acres for 20 years to assure performance by the Dodgers of its duty to provide and maintain the recreational facilities. If the Dodgers fully performed the agreements for 20 years, the city would convey legal title to the Dodgers without further consideration. (*Los Angeles Dodgers, supra,* 256 Cal.App.2d at pp. 919-920.) After the Dodgers had spent $500,000 in the construction of the facility and had made four $60,000 payments to the city but had not yet taken physical possession or control of the property, the county levied taxes on the property. (*Id.* at p. 921.) When the Dodgers challenged the levy, the court held the Dodgers had acquired equitable and beneficial ownership of the property, despite the retention of legal title by the city. (*Id.* at p. 924.)

Even though the agreement between the State and Mayhew in this case was in the form of a lease, as stated above, the State has acquired beneficial ownership of the property. Much like the situation in *Los Angeles Dodgers,* the State will receive legal title, if it fully performs under the agreements, without further consideration. In *Los Angeles Dodgers,* the court stated: " 'The form of the transfer is immaterial; the determinative question is whether private rights have supplanted those of the government insofar as the use of the property is concerned.' " (256 Cal.App.2d at p. 923, quoting *Eisley, supra,* 31 Cal.2d at p. 643.) In our case, the converse is true: The form of the transfer is immaterial; the determinative question is whether governmental rights have supplanted those of the private party insofar as the beneficial ownership is concerned.

"While it is generally recognized that tax exemption provisions must be strictly construed in favor of the taxing agency and against the taxpayer,

nonetheless such construction must be fair and reasonable with due regard for the ordinary meaning of the language used and *the objective sought to be accomplished.*" (*Kaiser Steel Corp.* v. *County of Solano* (1979) 90 Cal.App.3d 662, 666-667 [153 Cal.Rptr. 546], citations omitted, italics added.) The rule requiring strict construction of tax exemption provisions does not apply to taxation of state property. (*State Land Settlement Bd.* v. *Henderson* (1925) 197 Cal. 470, 481 [241 P. 560].) If it did, the constitutional exclusion of sovereign state property from taxation would be diluted. Instead, state property is not to be taxed unless there is express authority for the taxation. (*Ibid.*)

The State currently occupies the property as a beneficial owner and, in the normal course of the agreements, eventually will hold all incidents of ownership if it so chooses, regardless of anything anyone else might do. ▇▇▇ In finding the State is the beneficial owner of the property and thus finding the property is exempt from taxation, we also advance the objective of the constitutional provision which seeks to insulate the State from taxation. (See *Eisley, supra,* 31 Cal.2d at p. 642.) By the terms of the lease, the State must pay any property taxes. Therefore, the County seeks to take money from the sovereign's pocket.

Complying with the constitutional mandate which provides for the State's exemption from taxes, and recognizing the actual interests created in the State by these agreements rather than the apparent interests associated with the formalistic paper trail of legal title, we conclude the property is exempt from taxation under article XIII, section 3 of the California Constitution.

II

*Validity of the Agreements*

▇▇▇ According to the County, if the agreements between Mayhew and the State operated to convey to the State beneficial ownership of the property, the agreements are invalid because the Department of General Services was not authorized, under Government Code section 14669, to enter into such a transaction, which the County characterizes as an installment purchase contract. We disagree. The State's acquisition of beneficial ownership does not mean the agreements constituted a contract of sale beyond the authority of section 14669.

Government Code section 14669 provides the Department of General Services with the authority to "hire, lease, *lease-purchase,* or lease with the option to purchase any real or personal property for the use of any state

agency, . . ." (Italics added.) Even though the financing under the agreements came from the certificate holders and the State obtained the essential indicia of ownership, the agreement by which the State obtained the right to occupy the facility was a lease-purchase as allowed by section 14669. The County offers no authority and makes no argument stating a lease-purchase cannot confer beneficial ownership on the State for tax purposes. We, in fact, see no reason why a lease-purchase agreement and acquisition of beneficial ownership by the lessee should be mutually exclusive.

■ We also reject the County's argument the agreements violated the debt limitation provision of article XVI, section 1 of the California Constitution.[5] " 'It has been held generally in the numerous cases that have come before [the California Supreme Court] involving leases and agreements containing options to purchase that if the lease or other agreement is entered into in good faith and creates no immediate indebtedness for the aggregate installments therein provided for but, on the contrary, confines liability to each installment as it falls due and each year's payment is for the consideration actually furnished that year, no violence is done to the constitutional provision.' " (*City of Los Angeles* v. *Offner* (1942) 19 Cal.2d 483, 485-486 [122 P.2d 14, 145 A.L.R. 1358], quoted in *Dean* v. *Kuchel* (1950) 35 Cal.2d 444, 446-447 [218 P.2d 521].)

In *Dean* v. *Kuchel, supra,* a similar agreement qualified as a lease for debt limitation purposes. In that case, the State let property to a company for 35 years for $1. The company agreed to construct a building on the property and lease it back to the State for 25 years at a monthly rental of $3,325. If at the end of the 25-year lease the State had performed all covenants, the company would no longer hold any interest in the property. Regardless of the performance by the State, the property would vest fully in the State at the end of the 35-year lease to the company. (35 Cal.2d at pp. 445-446.) The State here, as in *Dean,* has no long-term liability for rental payments. If the Legislature and Governor do not provide funds annually for the rental payment, the trustee will sell or lease the property to pay off certificate holders and will give the remaining funds to the State. This year-to-year lease-purchase arrangement does not violate the debt limitation provisions of article XVI, section 1 of the California Constitution. (*Id.* at p. 448; see *McBean* v. *City of Fresno* (1896) 112 Cal. 159 [44 P. 358].)

## III

### *The County's Affirmative Defense Concerning Who Paid the Taxes*

Under Revenue and Taxation Code section 5140, the statute authorizing actions for refund of taxes, no one other than the payer of the tax may bring

---

[5]See footnote 1, *ante,* page 501, for the relevant text of article XVI, section 1 of the California Constitution.

an action for a refund. This statute, as it existed at all times relevant to our determination, specified, "The person who paid the tax, his guardian or conservator, the executor of his will, or the administrator of his estate may bring an action in the superior court against a county or a city to recover a tax which the board of supervisors of the county or the city council of the city has refused to refund on a claim filed pursuant to Article 1 (commencing with Section 5096) of this chapter. No other person may bring such an action; but if another should do so, judgment shall not be rendered for the plaintiff."

■ Citing this provision, the County's first affirmative defense in case No. C008317 alleged ComPlan did not pay the tax. The County now asserts the trial court granted summary judgment improperly because Mayhew failed to address this affirmative defense.

The first affirmative defense alleges only that ComPlan did not pay the tax. However, as noted earlier, the judgment was in favor of Mayhew only. The face of the pleadings and judgment show the County's contention lacks merit. Mayhew alleges it paid the taxes; the County alleges only ComPlan did not pay the taxes. The affirmative defense is irrelevant to Mayhew's recovery.

IV

*The State's Claim for Refund of Taxes It Did Not Pay*

■ Citing Revenue and Taxation Code section 5140, the court denied the State a refund of the taxes for tax years 1985-1986 and 1986-1987 because the State did not pay those taxes. The State argues this statutory limitation is irrelevant because the California Constitution, article XIII, section 3, exempts from taxation all property the State owns. Because the State is constitutionally exempt, contends the State, the exemption cannot be taken away by operation of a statute. We agree a statute cannot take away a constitutional right, but so agreeing does not compel refund to the State of taxes the State did not pay.

In *Easton* v. *County of Alameda* (1937) 9 Cal.2d 301 [70 P.2d 640], the Supreme Court enforced the provision for refunds only to those who paid the tax. Pursuant to the lease agreement, a lessee paid the property taxes assessed against the property. The owner then brought an action for refund. Construing Political Code section 3804, a predecessor of Revenue and Taxation Code section 5140, the court held the owner could not recover the taxes because he did not pay them, even though the taxes had been assessed

to him and it was his duty to pay them to the county. (9 Cal.2d at pp. 302-303.) "The limitation contained in section 5140 simply means that only a person who has actually paid the tax may bring an action as opposed to the situation where someone else pays the property taxes of an owner of property." (*Schoderbek* v. *Carlson* (1980) 113 Cal.App.3d 1029, 1037 [170 Cal.Rptr. 400].)

Revenue and Taxation Code section 5140 does not affect the determination of what property is taxable and what property is exempt. It merely defines the procedure for refunding taxes improperly collected. The procedure provides for refund to the person who, or entity which, paid the tax if the property was exempt. This orderly approach prevents double refund of the taxes to the party who paid the tax and the party who owns the tax-exempt property. The consolidation of these two cases reveals the County would have refunded the 1985-1986 fiscal year taxes twice if the State's argument had prevailed because Mayhew had already secured judgment refunding the taxes for that year.

Much like statutes of limitations and rules of pleading and practice, Revenue and Taxation Code section 5140 is a mechanism for enforcing constitutional and statutory rights. Failure to follow the correct procedural rules can result in forfeiture of the power to enforce the constitutional right. Thus, we find no merit in the State's argument section 5140 is irrelevant to its action for a refund. The State did not pay the taxes for tax years 1985-1986 and 1986-1987; it, therefore, cannot get a refund from the County through judicial relief. If Mayhew paid those taxes and the State reimbursed Mayhew through increased rental payments or otherwise, then the State should deal with Mayhew to retrieve those funds.

### DISPOSITION

The judgments in case Nos. C008317 and C008963 are affirmed. In case No. C008317, Mayhew is awarded costs on appeal. In case No. C008963, the parties shall bear their own costs.

Scotland, J., concurred.

BLEASE, Acting P. J.—I concur in the judgment and much of the majority opinion. I write separately to turn square the corners of the controversy and to set out in material detail the provisions of the agreements at issue.

The county (County) argues that the state (State) is party to a lease option agreement and that its only present interest is a possessory interest in the

leasehold; the title holder, ComPlan, Inc. (ComPlan), which is not exempt from taxation, holds the interest subject to taxation. The County also argues that if the agreement is construed to give the State a beneficial interest sufficient to escape taxation it violates the debt limitation provisions of article XVI, section 1 of the California Constitution. To avoid that result the County argues that the agreement should be construed as a lease.

The County poses the problem as a dilemma; either the State's interest is as a lessee, in which case ComPlan is liable for the property taxes, or it has entered a contract of sale which violates the debt limitations of the California Constitution. The dilemma does not hold up under analysis.

I agree with the majority opinion that the subject property is exempt from property taxation under article XIII, section 3, of the California Constitution because the state holds a beneficial interest in the property analogous to that obtained in a contract of sale. I also agree that the transaction does not violate the debt limitation provisions of the Constitution.

I

The property was developed by Mayhew Tech Center, Phase II (Mayhew) for the use of and eventual ownership by the Franchise Tax Board (State) pursuant to an integrated set of agreements.

A development and disbursement agreement between Mayhew, ComPlan, the State and First Interstate Bank of California (First Interstate) outlines the development project. In contemplation of a lease and eventual transfer of the property to the State, Mayhew undertook to develop the property, First Interstate agreed to monitor its construction and pay the development costs from funds held in an acquisition and construction fund pursuant to a trust agreement. Mayhew assigned to ComPlan, "as a limited successor in interest" the obligation to vest title in the property to the State as provided in sections 31, 32 and 33 of the lease between Mayhew and the State or "to convey title at the request of the Trustee upon the sale or other disposition of the Site and Project following termination of the Lease by reason of nonappropriation of funds by the State . . . ." Legal title to the property is vested in ComPlan pursuant to a site acquisition agreement between Mayhew, as seller, and ComPlan, as buyer of the property.

The lease provides that the State shall lease the property for the period March 1, 1983, through January 31, 2006. It is structured so that the acquisition and construction costs are paid off at the end of the rental period. A schedule shows the proportion of rents attributable to the reduction of

principal at various stages of the lease. In conformity with the site acquisition agreement the lease provides for the conditions under which title to the property vests in the State. Title to a portion of the site vested in the State on January 1, 1991. Title to the remaining property vests in the State if either the State exercises an option to purchase the property or "[u]pon . . . payment by the State of all Rental Payments due . . . ."

The State is obligated to make rental payments for the term of the lease subject to the "appropriation of funds" by the Legislature. Failing an appropriation the lease is terminated. "If on July 1 of each year during the term of this Lease funds are not appropriated by the California State Legislature [or 120 days thereafter] . . . this Lease shall terminate . . . and, . . . upon such termination the State shall vacate the Site and the Project and it shall have no further rights or title in or to the Site or the Project." Upon a default in payment of rent the lessor is authorized to retake possession of the property.

The trust agreement, signed by Mayhew and First Interstate Bank (as trustee), provides for the funding of the project through the issuance of debt instruments called certificates of participation. A certificate fund is created for the receipt of rents and the payment of the certificates. Section 4.05 of the trust agreement says that any surplus remaining in the certificate fund on any February 2 or August 2 of any year shall be paid to the State and "any surplus remaining after redemption and payment . . . of all Certificates . . . shall then be remitted to the State."

The trust agreement also provides for the case of a default in the payment of rents upon the failure of the Legislature to appropriate monies therefore. In that event the State has "no further rights or title" in the property except for the portion conveyed on January 1, 1991. The trustee is then authorized to retake possession of the property, lease it "for the account of the State" or, upon termination of the lease, "to sell, lease or otherwise dispose" of the property "except for the portion . . . conveyed to the State under Section 31 of [the] Lease." The agreement to convey title at the completion of all rental payments is thus subject to defeasance upon the failure of the Legislature so to act. In such case the lease provides that the State "shall have no further rights or title in or to the Site or the Project." Under section 12.06 of the trust agreement upon default the proceeds of any lease or sale are to be "deposited by the Trustee in the Certificate Fund upon the receipt thereof and applied to the payment of the obligations of the State under the Lease or applied to the redemption of the Certificates Outstanding."

## II

The lease and allied agreements are structured so that the State may acquire the property while avoiding the debt limitations of article XVI, section 1 of the California Constitution. To that end the parties engaged in a transaction that does not easily fit a recognizable category of real property. The property interests are split into possessory and remainder interests, both of which are held by the State; bare legal title is held by ComPlan by assignment from Mayhew. The State is also given an option to purchase the property. Title to a portion of the property has already been given the State. There is no right of reversion in Mayhew, the grantor. The property is held for the benefit of the creditors and the State. In addition to its possessory interest, the State appears to have a future interest in the property, a remainder which is vested subject to defeasance on the failure of the Legislature to appropriate money to pay the rents, an estate in land. (See 5 Miller & Starr, Cal. Real Estate (2d ed. 1989) §§ 11.27, 11.28.) Of consequence, the State has all of the incidents of ownership save those necessary to protect the interests of the creditors. As noted, the State also has an option to purchase the property. With respect to an analogous transaction it has been said: "Regardless of the form of the transaction, if the true substance is a sale, the courts treat it as a sale and not an option. The test is the economic impact on the parties from the terms of the transaction, as a question of fact. Even though the documents read as an option, if the practical economics of the transaction are such that, as a practical matter, the optionee must exercise the option or lose a valuable equity in the property, the transaction is, in effect, a sale of the property." (1 Miller & Starr, Cal. Real Estate (2d ed. 1989) § 2:39, p. 664.) That is obviously the practical consequence of the transaction in this case.

## III

The liability of the parties for property taxation must be judged from this vantage point. The State has the effective ownership interest in the property. ComPlan holds title to the property but its interest is limited to the obligation to convey title to the property as provided in the lease and allied agreements.

Ordinarily, the entire value of nonexempt land and improvements is assessed without distinction between possessory and reversionary interests. (See *De Luz Homes, Inc.* v. *County of San Diego* (1955) 45 Cal.2d 546, 563 [290 P.2d 544].) The State is exempt from property taxation. (Cal. Const., art. XIII, § 3.) When there is a split between the State's interest and a nonexempt interest the nonexempt interest alone is subject to tax. (See *De*

*Luz, supra,* 45 Cal.2d at p. 563.) In this case the State holds both the possessory and remainder interests. ComPlan, the nominal title holder, does not have an ownership interest; it acts as a trustee for the purpose of conveying title to the proper party in compliance with the agreements.

IV

The agreements avoid the debt limitation provision of article XVI, section 1 of the California Constitution. The measure of that provision is whether "the instrument creates a full and complete liability upon its execution . . . ." (*City of Los Angeles* v. *Offner* (1942) 19 Cal.2d 483, 486 [122 P.2d 14, 145 A.L.R. 1358]; see also *Dean* v. *Kuchel* (1950) 35 Cal.2d 444, 447 [218 P.2d 521].) That is avoided if "[e]ach year's income and revenue [to the governmental entity] must pay each year's indebtedness and liability, and no indebtedness or liability incurred in one year shall be paid out of the income or revenue of any future year." (*McBean* v. *City of Fresno* (1896) 112 Cal. 159, 164 [44 P. 358].) *McBean* concerned an analogous provision applicable to municipalities but the principle is fully applicable here. (See *Offner, supra,* 19 Cal.2d at p. 486.)

The City of Fresno had contracted with McBean to dispose of its sewage over a period of years, requiring the construction by McBean of sewage treatment facilities. The court held that the debt limitation provisions of the California Constitution then in force were not exceeded by reason of the length of the contract because the payment of each year's obligation was made contractually dependent upon the availability of revenues. "If there are not revenues for any given year sufficient and available for the payment of [McBean's] claims for that year, those claims become waste paper, and are not carried over as a charge against the income and revenue of a succeeding year." (*McBean, supra,* 112 Cal. at p. 165.)

Here, the State's obligation to pay rents is dependent upon the appropriation of moneys for that purpose by the Legislature. This case differs from *McBean* in that there is a large stimulus to legislative action, the loss of a valuable piece of property upon termination of the lease for failure of an appropriation and the extinction of the State's interest in the property. Nonetheless, the point of the debt limitation provisions is the avoidance of a "full and complete" obligation to pay the "debt" beyond that which can be presently satisfied with State revenues. Here, as in *McBean,* the contract does not impose such an obligation.

Unlike the ordinary conditional sales contract the agreements provide that the Legislature may terminate the obligation to pay by failing to appropriate

moneys for their payment. This circumstance is to be distinguished from that in which the Legislature exercises its *power* to repudiate a contractual obligation by refusing to appropriate funds for its payment. (Cf. *McCauley* v. *Brooks* (1860) 16 Cal. 11, 51.) In that case the contractual obligation is legally binding, but there are no means to enforce it for lack of a judicial remedy by which to compel the Legislature to appropriate money in compliance with the obligation. In such a case it is assumed that the Legislature would not wilfully default upon its contractual obligations. (*City of Sacramento* v. *California State Legislature* (1986) 187 Cal.App.3d 393 [231 Cal.Rptr. 686].)

This case differs in that the agreements provide that if the Legislature fails to appropriate money to pay the annual rents there is no contractual obligation to be enforced. Since there is no legal obligation to appropriate money for payments in future years there is no violation of the debt limitation provision of the California Constitution. (Civ. Code, § 3510.)

A petition for a rehearing was denied April 3, 1992, and appellants' petition for review by the Supreme Court was denied June 11, 1992, and June 12, 1992. Kennard, J., was of the opinion that the petition should be granted.