Filed 5/31/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

|  |  |
|---|---|
| CSHV 1999 HARRISON, LLC, et al.,<br>      Plaintiffs and Appellants,<br>v.<br>COUNTY OF ALAMEDA et al.,<br>      Defendants and Respondents. | A163369<br><br>(Alameda County<br>Super. Ct. No.<br>RG20060588) |

CalSTRS, the California State Teachers' Retirement System, created two limited liability companies (LLCs), appellants CSHV 1999 Harrison, LLC and CSHV 1956 Webster, LLC, for the purpose of purchasing and holding title to two investment properties in Oakland. Respondents City of Oakland (City) and County of Alameda (County) imposed documentary transfer taxes totaling over $3.5 million, which the LLCs paid. The LLCs subsequently filed a petition for writ of mandate seeking refunds, asserting they, like their sole member CalSTRS, are "political subdivisions" of the State of California and therefore exempt from paying the tax. The trial court disagreed and denied their petition. We affirm.

**BACKGROUND**

CalSTRS is a "unit of the Government Operations Agency" authorized to "invest the assets of the [Teachers' Retirement Fund] through the purchase, holding, or sale thereof of any investment, financial instrument, or

financial transaction." (Ed. Code, §§ 22001, 22203.) The Legislature has expressly declared the importance of CalSTRS's effective administration of retirement funds, stating it "finds and declares that changing economic conditions and increasing complexity in the investment market make it necessary and desirable that the system obtain the best possible investment expertise." (*Id.* § 22350; see *id.* § 22362, subd. (d) [requiring CalSTRS to make certain kinds of investments unless that "will result in lower overall earnings for the retirement fund than obtainable from alternative investment opportunities"].)

In 2016, CalSTRS formed two LLCs incorporated in Delaware for the purpose of acquiring two properties in Oakland. Both LLC agreements state "The purpose of the Company is to implement the essential governmental function of the Member ([CalSTRS]) by entering into that certain Contract of Sale (the 'Purchase Agreement') between the Company and [the LLC], . . . among others, in connection with the acquisition by the Company of the property located at [the specified location]. . . ." Both agreements provide that CalSTRS is the "only member of the Company and owns one hundred percent (100%) of the interests in the Company. No other person or entity may become a member of the Company. . . . [¶] . . . [¶] [CalSTRS] shall contribute the 'Purchase Price' of the Property pursuant to the Purchase Agreement." "[CalSTRS] is a unit of the California Government Operations Agency and is an integral part of the State of California performing an essential governmental function. The [LLCs], which [are] wholly owned by [CalSTRS], [are] also an integral part of the State of California performing an essential governmental function. The income of the [LLCs] will be derived from the exercise of an essential governmental function and will accrue only to [CalSTRS]."

As to liability, the agreements provide "The debts, obligations[,] and liabilities of the Company, whether arising in contract, tort[,] or otherwise, shall be solely the debts, obligations[,] and liabilities of the Company, and the Member shall not be obligated personally for any such debt, obligation[,] or liability of the Company solely by reason of being a member of the Company."

As to tax matters, the agreements state "For Federal and relevant State income and/or franchise tax purposes and for no other purposes whatsoever, the Company shall be disregarded as an entity separate from [CalSTRS], as provided in Section 301.7701-3(a) of the Federal Income Tax Regulations[1] and any comparable provision of the relevant State income or franchise tax law. . . ."

The following month, the LLCs acquired the Harrison and Webster properties. In connection with the purchase of the Harrison property, the Harrison LLC paid documentary transfer taxes of $3,371,250 to the City of Oakland, and $247,225 to Alameda County. In connection with the Webster property, the Webster LLC paid taxes of $161,250 to the City of Oakland, and $11,825 to Alameda County.

About a year later, the LLCs sought refunds of the documentary transfer taxes by pursuing their administrative remedies with the City and County. After their refund requests were denied, the LLCs filed a petition for writ of mandate.

Following a bench trial, the superior court ruled "[t]he LLCs are not governmental entities even if a governmental entity is the sole member of the LLC." The court further ruled the City and County ordinances do not "provide a textual basis for an exemption for transactions in which a business

---

[1] 26 Code of Federal Regulations section 301.7701-3(a).

3

entity takes ownership of real property based on that entity's ownership" by an exempt state agency. The court therefore denied the petition and entered judgment in favor of the City and County.[2]

## DISCUSSION

### *The Documentary Transfer Tax*

"The documentary transfer tax is a tax that may be imposed upon the transfer of ownership of real property." (102 Ops.Cal.Atty.Gen. 78 (2019).) It is "an excise tax on the privilege of conveying real property by means of a written instrument." (*926 North Ardmore Ave., LLC v. County of Los Angeles* (2017) 3 Cal.5th 319, 332, fn. 13 (*North Ardmore*).)

Local governments may impose "a tax upon conveyances of real property as authorized under the Documentary Transfer Tax Act (Rev. & Tax. Code, §§ 11901–11934 (the 'Act')).[3] The Act provides numerous exemptions from the tax (§§ 11921–11930), including when a government agency is acquiring title to real property." (85 Ops.Cal.Atty.Gen. 235 (2002).)

Specifically, section 11911 authorizes a city or county to levy a tax "on each deed, instrument, or writing by which any lands, tenements, or other realty sold within the county shall be granted, assigned, transferred, or otherwise conveyed to, or vested in, the purchaser or purchasers" if "the consideration or value of the interest or property conveyed (exclusive of the value of any lien or encumbrance remaining thereon at the time of sale) exceeds one hundred dollars ($100)." (§ 11911, subds. (a), (b).) "Any tax

---

[2] We granted the request of the League of California Cities and the California State Association of Counties for leave to file an amicus brief in support of the City and County.

[3] All further undesignated statutory references are to the Revenue and Taxation Code.

4

imposed pursuant to Section 11911 shall be paid by any person who makes, signs or issues any document or instrument subject to the tax, or for whose use or benefit the same is made, signed or issued." (§ 11912.) Oakland, as a charter city, is also authorized by our state Constitution to impose a transfer tax under the "home rule" doctrine. (See *CIM Urban Reit 211 Main St. (SF), LP v. City and County of San Francisco* (2022) 75 Cal.App.5th 939, 949–950.)

"Section 11911 is derived from a provision of the former federal documentary stamp act . . . (26 U.S.C. former § 4301 et seq. (1964), repealed by Pub.L. No. 89-44, tit. VIII, § 802(a)(2) (June 21, 1965) 79 Stat. 159)." (*North Ardmore, supra,* 3 Cal.5th at p. 329.) Like documentary transfer taxes under our state and local law, the federal "stamp act also imposed a tax on written instruments conveying 'lands, tenements, or other realty sold' in return for consideration. (26 U.S.C. former § 4361 (1964).)" (*Ibid.*)

Section 11922 provides for an exemption for state entities and political subdivisions, stating "Any deed, instrument or writing to which the United States or any agency or instrumentality thereof, any state or territory, or political subdivision thereof, is a party shall be exempt from any tax imposed pursuant to this part when the exempt agency is acquiring title."

Pursuant to this statutory authority, both the City and County enacted documentary transfer taxes that provide an exemption for government entities. (Oakland Mun. Code, §§ 4.20.020, 4.20.040, 4.20.050(E); Alameda Ord. Code, §§ 2.04.020, 2.04.060.)

Oakland's exemption states, "the United States, state of California, any city, county, city and county, district or any other political subdivision of the state of California shall be exempt from any liability for the tax imposed herein." (Oakland Mun. Code, § 4.20.040.) Alameda County's exemption similarly states, "Any deed, instrument or writing to which the United States

5

or agency or instrumentality thereof, any state or territory, or political subdivision thereof, is a party shall be exempt from any tax imposed pursuant to this chapter when the exempt entity of government is acquiring title." (Alameda Ord. Code, § 2.04.060.)

" 'While it is generally recognized that tax exemption provisions must be strictly construed in favor of the taxing agency and against the taxpayer, nonetheless such construction must be fair and reasonable with due regard for the ordinary meaning of the language used and the objective sought to be accomplished.' [Citation.] The rule requiring strict construction of tax exemption provisions does not apply to taxation of state property. (*State Land Settlement Bd. v. Henderson* (1925) 197 Cal. 470, 481. . . .) If it did, the constitutional exclusion of sovereign state property from taxation would be diluted. Instead, state property is not to be taxed unless there is express authority for the taxation. (*Ibid.*)" (*Mayhew Tech Center, Phase II v. County of Sacramento* (1992) 4 Cal.App.4th 497, 506–507 (*Mayhew*), italics omitted.)

***The LLC Statutes and Agreements***

The parties do not dispute that CalSTRS is a state agency and exempt from paying any documentary transfer tax in connection with real property it acquires.[4] Rather, they dispute whether the LLCs share CalSTRS's exempt status because CalSTRS created and is the sole member of the LLCs and because the LLCs have no purpose other than furthering CalSTRS's public mission to manage public pension funds as effectively as possible.

---

[4] "[T]he State Teachers' Retirement System is . . . a unit of the Government Operations Agency." (Ed. Code, § 22001.) "Deeds transferring title of real property to the State Teachers' Retirement System are not subject to a county documentary transfer tax." (68 Ops. Atty. Gen. 71 (1985).)

A considerable number of states, including California and Delaware under which the LLCs here were formed, have enacted a statutory scheme governing LLCs based on the Revised Uniform Limited Liability Company Act[5] as promulgated by the National Conference of Commissioners on Uniform State Laws in 2006.[6] (Brent A. Olson, California Business Law Deskbook (2022) §§ 1:5(a), 3:1(a), (e); *Elf Atochem North American, Inc. v. Jaffari* (Del. 1999) 727 A.2d 286, 290.) Generally, LLCs "can be created with flow-through tax treatment, limited liability for its owners, perpetual existence, free transferability of interests, and either centralized management or some other management structure." (*Id.* at §§ 1:5(a), 3:1(a), (c); see generally *Northwest Energetic Services, supra,* 159 Cal.App.4th at pp. 852–853.) "These developments make the LLC the most appealing non-corporate entity for business organization purposes. As such, the LLC is fast becoming the entity of choice for closely held businesses in the United States." (California Business Law Deskbook, at §§ 1.5(a), 3:1(a); see also *Northwest Energetic Services,* at p. 852 ["In light of the growing popularity of LLC's, the California Legislature enacted the LLC Act with the aim of expanding California's competitive business environment."].[7])

---

[5] Corporations Code section 17701.01 et seq.

[6] California first enacted legislation authorizing LLCs in 1994 as part of the Beverly–Killea Limited Liability Company Act (former Corp. Code, § 17000 et seq.). "Before the enactment, a business entity could form in California only as a corporation, partnership, or sole proprietorship." (*Northwest Energetic Services, LLC v. California Franchise Tax Bd.* (2008) 159 Cal.App.4th 841, 852 (*Northwest Energetic Services*).)

[7] LLCs are perceived as being particularly advantageous to small business enterprises. (*Northwest Energetic Services, supra,* 159 Cal.App.4th at p. 852; Brent A. Olson, California Business Law Deskbook, *supra,* at § 3:1(a) [given that an LLC "will have flow-through tax status even though it exhibits the 'corporate' characteristics of limited liability, continuity of life,

Under both California and Delaware law, a "limited liability company is an entity distinct from its members." (Corp. Code, § 17701.04, subd. (a); Del. Code Ann., tit. 6, § 18-701; *Curci Investments, LLC v. Baldwin* (2017) 14 Cal.App.5th 214, 220 [under California law, an LLC is ordinarily considered a distinct entity from its members and manager]; *In re Opus East, LLC* (Bankr. D.Del. 2012) 480 B.R. 561, 575 [" 'A member has no interest in specific limited liability company property.' "].)

The tax advantages of "the LLC form of business is the ability, assuming proper organization, to avoid the double taxation of corporate income and shareholder dividends by having an eligible LLC elect to be treated as a partnership for federal tax purposes without being subject to as many restrictions as 'subchapter S corporations.' [Citation.] [¶] Moreover, a 'single-member' LLC . . . has the option of electing either to be taxed as an association (i.e., a corporation) or, like a sole proprietorship, to be disregarded as an entity separate from its owner. 26 C.F.R. § 301.7701–3(a) (2003). If the single-member LLC elects to be taxed as a sole proprietorship, the LLC itself does not pay taxes and does not have to file a separate tax return. 26 C.F.R. 301.7701–2(a) (2003); Cal. Rev & Tax Code § 23038(b)(2)(B)(iii). Rather, the single member reports all LLC profits or losses on a personal tax return as if the business was a sole proprietorship." (*In re KRSM Properties, LLC* (Bankr. 9th Cir. 2004) 318 B.R. 712, 718–719, fns. omitted.)

Consistent with the governing statutes, the LLC agreements here provide, "The debts, obligations[,] and liabilities of the Company, whether arising in contract, tort[,] or otherwise, shall be solely the debts, obligations[,]

and free transferability of 'transferable interests,' " "the LLC is the typical choice of entity for the small business organization, particularly for a business seeking flexibility in its governance and operations"].)

8

and liabilities of the Company, and the Member shall not be obligated personally for any such debt, obligation[,] or liability of the Company solely by reason of being a member of the Company." (See Corp. Code, § 17703.04, subd. (a)(1).)

With respect to taxation, the agreements specify, "For Federal and relevant State income and/or franchise tax purposes *and for no other purpose whatsoever*, the Company shall be disregarded as an entity separate from [CalSTRS], as provided in Section 301.7701-3(a) of the Federal Income Tax Regulations and any comparable provision of relevant State income or franchise tax law. . . . [E]ach of the assets and each of the liabilities of the Company shall be treated as an asset or a liability (as appropriate) of [CalSTRS] (and not of the Company) for Federal and relevant State income and/or franchise tax purposes *and for no other purpose whatsoever*."[8] (Italics added.)

Thus, the statutory provisions governing the two LLCs expressly provide they are *separate* entities distinct from their member, CalSTRS. The LLC agreements, in turn, expressly state the *only* exception in this regard is as permitted by federal and state income tax law.

The LLCs nevertheless urge that we can, and should, disregard their separate entity status for the additional purpose of the documentary transfer tax, citing a recent opinion by our state Attorney General, cases decided under the former Federal Stamp Act, and cases discussing "beneficial

---

[8] These provisions are in conformance with income tax law allowing LLCs with "a single owner [to] elect to be classified as an association or to be disregarded as an entity separate from its owner." (26 C.F.R. § 301.7701-3(a).) "If the separate existence of an eligible business entity is disregarded for federal tax purposes, the separate existence of that business entity shall be disregarded for purposes of this part." (§ 23038, subd. (b)(2)(B)(iii).)

9

ownership" and "change of ownership." As the LLCs' legal authorities evidence, the parties have not cited to, nor are we aware of, any case addressing the specific issue at hand—whether an LLC created by a government entity to accomplish its public functions can be deemed a "political subdivision" of the state exempt from a documentary transfer tax. We therefore turn to the authorities cited by the LLCs.

***Attorney General Opinions***

"Although we are not bound by the Attorney General's interpretation of a statute, ' " '[a]bsent controlling authority, [the Attorney General's opinion] is persuasive because we presume that the Legislature was cognizant of the Attorney General's construction of [the statute] and would have taken corrective action if it disagreed with that construction.' " ' " (*Towner v. County of Ventura* (2021) 63 Cal.App.5th 761, 773 (*Towner*).)

The LLCs direct our attention to a 2019 opinion responding to an inquiry by the County of Santa Barbara as to whether "a nonprofit public benefit corporation that is an instrumentality of a city housing authority" is exempt from the documentary transfer tax. (102 Ops.Cal.Atty.Gen. 78, at p. *1 (2019).) The Attorney General concluded, "A housing authority created under state law 'constitutes a corporate and politic public body, exercising public and essential governmental functions. . . .' Therefore[,] a housing authority is a government agency, and thus exempt from the documentary transfer tax under section 11922. [¶] We see no material difference arising from the circumstance that the taxable event—filing a deed or other instrument of property transfer—is undertaken by the nonprofit public benefit corporation created by the public agency, rather than by the housing agency itself. When it exercises the powers of a public housing agency, a

10

nonprofit created by the housing agency is a 'political subdivision' entitled to an exemption from the documentary transfer tax." (*Id.* at p. *3.)

The LLCs maintain "[t]he same rule should be applied to a single member limited liability company that is wholly owned by a state agency and irrevocably dedicated to essential government functions."

The Attorney General's opinion, however, *presumed* the nonprofit public benefit corporation in question was an instrumentality of the city housing authority—it did not decide that issue. (102 Ops.Cal.Atty.Gen., *supra,* at p. * 1.) Rather, it observed "it is common for housing authorities in California to create nonprofit public benefit corporations." It further observed that in a prior opinion, the Attorney General "noted that the [Documentary Transfer Tax] statute uses the term 'exempt agency' as a broad catch-all in its final phrase: 'when the exempt agency is acquiring title.' " (*Id.* at p. * 3.) "This sweeping usage indicated . . . the exemption was intended to be applied inclusively: '[I]f the entity involved can be classified as a government agency, it is exempt from the tax.' After also examining the legislative history, we concluded that the use of 'political subdivision' in section 11922 was meant to apply broadly rather than restrictively, and that county water districts did qualify for the exemption." (*Ibid.*)

The opinion to which the 2019 opinion referred considered whether a county water district is a " 'political subdivision' " of the state for purposes of the documentary transfer tax. (56 Cal.Ops.Atty.Gen. 79 (1973).) The Attorney General therein observed "there are different California authorities which could be mechanically cited in favor of or against the inclusion of county water districts within the term 'political subdivision.' " (*Id.* at p. 81.) He therefore endeavored "to discover whatever legislative intent can be found regarding the scope of the term 'political subdivision' as used in the

11

particular statute at hand." (*Ibid.*) And in that undertaking, the Attorney General examined the former federal stamp tax, which the state tax replaced and on which it was modeled. (*Id.* at pp. 81–83.) He concluded Congress had "acted to *broaden* the coverage of the exemption as to the type of property acquired by governmental entities" and, thus, endorsed a view of the state exemption for " 'political subdivision[s]' " "broad enough to include special districts such as the county water district." (*Id.* at p. 83; *ibid.* ["the section as presently worded indicates by its use of the term 'exempt agency' as an all-inclusive term that if the entity involved can be classified as a governmental agency, it is exempt from the tax"].) Citing to a number of cases treating water districts as government entities in a variety of contexts, the Attorney General stated "[a]bout the clearest conclusion that can be drawn in this entire area of classification of governmental entities is that county water districts and similar special districts can be classified as 'state,' 'governmental,' and 'public' agencies." (*Ibid.*)

The Attorney General took the same approach nearly three decades later in 2002, when considering whether a "city" is a " 'political subdivision' " of the state for purposes of the documentary transfer tax. (85 Ops.Cal.Atty.Gen. 235, at pp. *1–2 (2002).) That opinion recited that for some purposes cities are recognized as political subdivisions of the state, and for others they are not. Thus, as with county water districts, different California authorities " 'could be mechanically cited' " for designating a city either way. (*Id.* at p. *4.) Looking to both the prior Federal Stamp Act exemption, and the legislative history of the state statute which included broad statements that " 'Federal, state and local government agencies are exempted from the tax,' " the Attorney General concluded cities are " 'political

12

subdivisions' " of the state for purposes of the documentary transfer tax. (*Id.* at pp. *8–9.)

It is true these Attorney General opinions reflect a "broad" view as to whether an entity is a political subdivision of the state for purposes of the documentary transfer tax. However, a nonprofit public benefit corporation, a county water district, and a city are fundamentally different creatures from an LLC. Nor can we say "there are different California authorities" that can be "mechanically cited in favor of or against the inclusion of" an LLC created by a government entity to advance the entity's public purposes "within the term 'political subdivision.' " (56 Cal.Ops.Atty.Gen., *supra,* at p. 81.)

Thus, the Attorney General opinions do not carry the weight required to disregard the general statutory provisions governing LLCs and the correlative language of the LLC agreements at issue.

We nevertheless acknowledge there is some tension between the express statutory mandate to CalSTRS to maximize returns on the retirement funds it manages and the general statutory provisions applicable to LLCs that specify their separateness from members and managers. Concluding that the LLCs must pay the City's and County's documentary transfer taxes effectively removes $3.53 million from the teacher's retirement system solely because CalSTRS utilized this relatively new form of entity to acquire the investment properties. Had CalSTRS, itself, purchased the properties, no transfer tax would have been assessed. Thus, it might be argued the city and county have effectively received a windfall solely because CalSTRS used LLCs, of which it is the sole member and which have no purpose other than to fulfill CalSTRS's statutory mission to manage and maximize public pension funds, to purchase the properties rather than

13

purchasing them directly.  But that is a case CalSTRS must make to the Legislature.[9]

### *Former Federal Stamp Tax Cases*

The LLCs also rely on four cases involving the former federal stamp act, asserting the act would have "exempt[ed] a state agency's acquisition of realty by a wholly-owned, single-member limited liability company." (Capitalization omitted.)  Even apart from the fact LLCs did not exist during the time the stamp act was operative (see *North Ardmore Avenue, supra,* 3 Cal.5th at p. 334 [commenting it was unsurprising that no federal authority addressed "the stamp act's application to a transaction exactly like this one" involving a commercial LLP because "[w]hen the stamp act was in effect, limited liability companies did not exist and tax laws created disincentives for small businesses to take the corporate form"]), the cases are distinguishable.

*Murray v. Hoey* (S.D.N.Y. 1940) 32 F.Supp. 1008, involved a will that provided the residue of a sizeable estate would be allocated among 14 corporate charitable beneficiaries.  (*Id*. at p. 1009.)  To facilitate the management of the residual properties, the beneficiaries had an act introduced in the New York State Legislature to incorporate a foundation to manage and liquidate the properties.  (*Ibid*.)  The beneficiaries deeded the properties to the new foundation, and the federal government imposed the stamp tax on the deeds.  (*Ibid.*)  The federal district court invalidated the

---

[9] The City and County point out that by employing LLCs CalSTRS is able to limit its liability and receive certain tax benefits.  But these are hardly reasons to conclude the LLPs cannot share CalSTRS's exempt status. To the contrary, they are the sort of benefits we would expect CalSTRS to seek in fulfilling its mission to responsibly maximize returns on the pension funds it invests.

imposition of the tax, stating the state act creating the foundation "sufficiently characterize[d] its status as *trustee*," thus exempting the transfers from the tax. (*Id*. at p. 1012, italics added.)

*Berry v. Kavanagh* (6th Cir. 1943) 137 F.2d 574, involved "deeds executed to a reinsurer by a statutory receiver of a reserve life insurance company in liquidation." (*Id*. at p. 574.) The federal circuit court concluded the deeds were executed "to convey the naked legal title of the real estate in question to the grantee for the purpose of managing, conserving and liquidating the real estate for the benefit of the policyholders of the insolvent company." (*Id*. at p. 576.) The court construed the contract and deed "as a whole" and concluded "there was created an *agency to sell* and not the relationship of vendor and vendee." (*Ibid*., italics added.)

*Berkeley Savings & L. Ass'n of Newark, N.J. v. United States* (D. Ct. N.J 1969) 301 F.Supp. 22, dealt with a loan guarantee program under which the Veterans Administration (VA) sold properties to individual purchasers through installment contracts and retained legal title "until an individual purchaser's monthly payments had reduced the balance of the purchase price to a certain amount," at which point the purchaser would gain legal title. (*Id*. at p. 23.) Before some of the individual purchasers acquired legal title, the VA assigned the installment contracts and conveyed legal title to the plaintiff savings and loan. (*Id*. at p. 24.) The district court concluded no tax was due on those deeds, stating "the tax does not apply to a conveyance of realty to a building and loan association for the purpose of *securing a loan* thereon. . . ." (*Id*. at p. 28, italics added.)

*Columbia Gas of Pennsylvania, Inc. v. United States* (3rd Circ. 1971) 446 F.2d 320, involved a stamp tax imposed on a transfer of stock and real estate between a corporation and its subsidiary as part of a "plan of corporate

15

simplification." (*Id.* at pp. 320–321.) The issue was whether a former Internal Revenue Code exemption—for " '[t]he issuance, transfer, or exchange of securities, or the making, delivery, or filing of conveyance, to make effective any plan of reorganization or adjustment . . . [¶] . . . [w]hereby a mere change in identity, form or place of organization is effected' "—applied. (*Id.* at p. 322, italics omitted, quoting former Int.Rev. Code, § 4382 (b)(1)(D).) The circuit court concluded "Congress intended to exempt a generic class of formalistic transactions involving no change in ownership and no new dedication of capital." (*Columbia Gas of Pennsylvania, Inc.,* at p. 324.)

In short, these cases all considered whether a "change in ownership" had occurred such that the transaction constituted a transfer under the former federal stamp act, a question not at issue in this case. Indeed, there is no dispute a change in ownership occurred here. Moreover, none of these cases considered a context akin to that here, namely whether an LLC created by a government entity to facilitate the entity's public purposes, is exempt from paying a documentary transfer tax.[10]

**"Beneficial Ownership" Cases**

Asserting "it is well-established that taxing authorities must elevate substance over form," the LLCs also maintain CalSTRS acquired a "beneficial interest in the properties" and thus " 'holds "the essential indicia of

---

[10] The LLCs also assert "the city and county ordinances are founded on federal income tax principles" (capitalization omitted) and because "[f]ederal income tax recognizes disregarded entities," such as when a member of an LLC "elects to disregard the single-member limited liability company for federal income tax purposes, the entity is required to be disregarded for California income tax purposes." As we have discussed, the state documentary transfer tax is based on the former federal stamp act, not federal income tax law. (See *North Ardmore, supra,* 3 Cal.5th at p. 329.)

16

ownership," ' " thereby imbuing the LLCs with CalSTRS's tax exempt status. The LLCs cite *Mayhew, supra,* 4 Cal.App.4th 497 and *North Ardmore, supra,* 3 Cal.5th 319, in support this assertion. Both cases are distinguishable.

In *Mayhew*, the State of California accepted the bid of a developer (Mayhew Tech Center, Phase II (Mayhew)) to build a new facility for the Franchise Tax Board. (*Mayhew, supra,* 4 Cal.App.4th at p. 501.) Funds for acquisition of the property came from the proceeds of a sale of certificates issued by a trustee. (*Ibid.*) The State leased the property from Mayhew, with the rental payments going to pay the certificate holders. (*Ibid.*) Mayhew, in turn, "transferred its right to receive rental payments to the trustee for the benefit of the certificate holders . . . [and] transferred legal title to the property to ComPlan, Inc. (ComPlan)." (*Ibid.*) At the end of the lease, legal title would "automatically vest in the State if all rental payments [were] made." (*Ibid.*) The State could "unilaterally terminate the lease, without penalty, in the event the Legislature and Governor fail to provide funds for a rental payment. In such an event, the State would have no further rights in the property." (*Id*. at pp. 501–502.)

Mayhew and ComPlan, as well as the State, subsequently sought a refund of property taxes they had paid, claiming the property was state-owned and therefore exempt from taxation.[11] (*Mayhew*, *supra*, 4 Cal.App.4th at pp. 503–504.) The county maintained the "agreements create[d] no more

---

[11] Mayhew and ComPlan claimed exemption from property taxes, not documentary transfer taxes, under article XIII, section 3 of the California Constitution (*Mayhew*, *supra*, 4 Cal.App.4th at p. 501), which provides: "The following are exempt from property taxation: (a) Property owned by the State." (Cal. Const., art. XIII § 3, subd. (a).)

17

than a leasehold in the State, not ownership." (*Id.* at p. 504.)  The trial court ordered refunds, and the Court of Appeal affirmed.  (*Id.* at pp. 503–504, 510.)

The appellate court observed that, although " '[t]he owner of the legal title to property is presumed to be the owner of the full beneficial title, . . . [a] title clause standing alone is not conclusive of ownership for tax purposes,' " quoting *General Dynamics Corp. v, County of L.A.* (1958) 51 Cal.2d 59, 67. (*Mayhew*, *supra*, 4 Cal.App.4th at pp. 504–505.)  "To ascertain ownership for tax purposes, the court must examine the terms of the agreements involved and determine who holds 'the essential indicia of ownership.' " (*Id.* at p. 505.)

The court then examined the financial arrangement between Mayhew and the State, concluding it "closely resemble[d] the financing of a purchase through a loan secured by a deed of trust on the subject property." (*Mayhew*, *supra*, 4 Cal.App.4th at p. 505.)  Under the arrangement, "the buyers of the certificates . . . provided funds for the purchase. . . .  The rents paid under the lease are for the benefit of the certificate holders, and in the event of default in paying the rent, the trustee will sell or lease the property to pay off, first, the certificate holders.  The remaining funds will go to the State.  Mayhew is left without an interest in the property, and the legal title transferred to ComPlan does not include the right to receive rents, contains no reversionary interest, and will be automatically divested in the event of expiration of the lease or default on the payment of rent." (*Ibid.*)

"Furthermore, the lease provides for automatic vesting of title in the State at the expiration of the lease if all rental payments are made.  Even in the event of [a] default on rental payments, the State would receive the funds remaining after sale of the property and payment of the certificate holders.  In other words, any equity remaining in the property belongs to the State.  As in a conditional sale setting, the State holds beneficial ownership both in the

18

practical and legal sense because it has possession and use of the property to the complete exclusion of all others, subject only to its own default and the remedies which would result." (*Mayhew*, *supra*, 4 Cal.App.4th at p. 505.) Under these circumstances, the court concluded the State "holds beneficial ownership for [property] tax purposes." (*Ibid.*)

The circumstances in *Mayhew* differ markedly from those here. *Mayhew* involved a rather complex financial transaction in which the state not only had "possession and use of the property to the complete exclusion of all others," but also would automatically be vested with title upon conclusion of the lease term. (*Mayhew*, *supra*, 4 Cal.App.4th at p. 505.) And even if the full transaction was not consummated, the state would recoup any equity. In short, the transaction was effectively a financed "sale" to the state. Under these circumstances, the state was the beneficial owner for property tax purposes. Here, in contrast, there was a straightforward sale to the LLCs and they are not effectively fulfilling the role of a lender that holds naked title to the property for security.

In *North Ardmore, supra,* 3 Cal.5th 319 a couple established a family trust to which they transferred an apartment building. (*Id.* at pp. 324–325.) After the husband's death, the family trust's assets were transferred to an administrative trust for the wife's benefit, with the couple's two sons named as successor trustees. (*Id.* at p. 325.) The sons formed an LLC to acquire and hold the apartment building, with the administrative trust as the sole member. They also formed a partnership in which the administrative trust owned a 99 percent interest. (*Ibid.*)

The administrative trust conveyed the building to the LLC and conveyed its membership interest in the LLC to the partnership. (*North Ardmore, supra*, 3 Cal.5th at p. 325.) The trust also divided its 99 percent

19

interest in the partnership and distributed it to four subtrusts for the benefit of the wife. None of these transfers triggered the documentary transfer tax, because the transactions simply "moved the [apartment building's] legal ownership among the various entities . . . [b]ut [the wife's] beneficial interest remained unchanged." (*Ibid.*)

However, the following year, three of the subtrusts transferred their interests in the partnership to two trusts maintained for the two sons, resulting in the two sons acquiring "a beneficial interest in the [apartment building] they had not held before." (*North Ardmore*, *supra*, 3 Cal.5th at p. 325.) After the transfers, each of the sons' trusts held a 44.595 percent interest in the partnership, which was the sole member of the LLC. (*Id.* at p. 326.) The LLC continued to hold legal title to the apartment building. (*Ibid.*) The sons' trusts executed promissory notes to the three subtrusts in consideration for the transferred assets. (*Ibid.*)

The issue before the high court was whether there had been a "change in ownership" for the purposes of the documentary transfer tax, thus allowing the county to tax the "written instruments that transferred [the] interests in [the partnership] from [the] subtrusts to the [sons'] trusts." (*North Ardmore*, *supra*, 3 Cal.5th at pp. 326, 328.) In other words, the issue was whether a transfer of an *interest in a legal entity* holding title to a property can result in a change in ownership in the property triggering the transfer tax.

The Supreme Court concluded a transfer of an interest in a legal entity can trigger the tax "so long as there is a written instrument reflecting a sale of the property for consideration." (*North Ardmore*, *supra*, 3 Cal.5th at p. 338.) Because the sons' trusts paid the wife's subtrusts "for the interests they acquired in the [b]uilding," there was consideration for the sale. (*Ibid.*)

20

Accordingly, the transfer from the wife's three subtrusts to the sons' trusts was a sale of property to which the documentary transfer tax applied. (*Ibid*.)

As we have pointed out, there is no "change of ownership" issue in this case, let alone any issue arising from the transfer of an interest in an entity for consideration as was the case in *North Ardmore.*

In sum, the "beneficial interest" cases on which the LLCs rely involved materially different circumstances and do not advance their assertion that CalSTRS holds all "beneficial interest in the properties" and therefore "the essential indicia of ownership" for purposes of the documentary transfer tax.[12]

### *The Property Tax Context*

In urging affirmance, the City and County direct our attention to constitutional and statutory provisions pertaining to property taxation and point out that despite the constitutional exemption from such tax for property "owned by the State" (Cal. Const., art. XIII, § 3, subd. (a)), the LLCs have never claimed to be exempt and have paid property taxes since purchasing the properties. Indeed, the City and County assert the Legislature has

---

[12] The LLCs have sought judicial notice of a copy of the July 21, 2016, contract of sale, asserting it supports their exemption claim because it was signed on behalf of the LLCs by the deputy chief investment officer of CalSTRS, the LLCs' "sole member." The document was not before the trial court or part of the administrative record. It is also irrelevant as there is no dispute that CalSTRS is the sole member of the LLCs and as such manages and controls the LLCs. In any case, "the existence of a contract between private parties cannot be established by judicial notice under Evidence Code section 452, subdivision (h)." (*Gould v. Maryland Sound Industries, Inc.* (1995) 31 Cal.App.4th 1137, 1145.) Nor is the document subject to judicial notice an "[o]fficial act[]"of a government agency as it was signed by the deputy chief investment officer of CalSTRS as the sole *member* of the LLCs. We therefore deny the request for notice.

21

expressly stated that only property directly owned by CalSTRS is exempt from property taxation and that property owned indirectly by CalSTRS through an entity like an LLC is not exempt.

The Legislature has made a number of explicit references to LLCs, in the context of property taxation. Section 214, for example, expands on the state constitutional exemptions from property taxation and provides a litany of additional exemptions. One such exemption, commonly referred to as the "welfare exemption," states in pertinent part: "Property used exclusively for religious, hospital, scientific, or charitable purposes owned and operated by community chests, funds, foundations, *limited liability companies*, or corporations organized and operated for religious, hospital, scientific, or charitable purposes is exempt from taxation. . . ." (§ 214, subd. (a), italics added.)

Section 214.8, in turn, states "the 'welfare exemption' shall not be granted to any organization unless it is qualified as an exempt organization" under specified state or federal tax statutes. (§ 214.8, subd. (a).) Subdivision (c) specifically addresses LLCs and states in pertinent part, "a limited liability company wholly owned by one or more qualifying organizations, *which may include governmental entities* and nonprofit organizations, that are exempt under Section 23701d or under Section 501(c)(3) of the Internal Revenue Code, shall qualify as an exempt organization." (*Id.*, subd. (c)(1), italics added.)

State Board of Equalization regulations further elucidate that, "A qualifying organization is also a government entity that is exempt from property taxation under section 3 of Article XIII of the California Constitution, as to property owned by the state under subdivision (a), or as to property owned by a local government under subdivision (b), or as to property

used exclusively for public schools, community colleges, state colleges and state universities under subdivision (d). A limited liability company is a qualifying organization if one or more of its members is a government entity, as specified, and all other members are exempt under section 501(c)(3) of the Internal Revenue Code or under section 23701d of the Revenue and Taxation Code and qualify for exemption under section 214 of the Revenue and Taxation Code." (Cal. Code Regs., tit. 18, § 136, subd. (b)(2).)

Thus, in the context of property taxation, the Legislature and the Board of Equalization have drawn a clear distinction between property owned directly by the "state" and local governments, and property owned by an LLC of which a "government entity" may be a member. In other words, the Legislature and Board appear to consider the general statutory provisions governing LLCs to be controlling in the tax context unless a statutory provision specifies otherwise. The Board has therefore observed, "While specific statutory and regulatory provisions may allow a single member limited liability company (LLC) to disregard its separate existence for purposes of income tax filing, there is no authority for disregarding an LLC's separate entity status for purposes of ownership, operation, or use of property in determining eligibility for the welfare exemption under Revenue and Taxation Code section 214."[13] (California State Board of Equalization,

---

[13] California Board of Equalization annotations are not controlling upon the courts, but they do " ' " 'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.' " ' " (*Letterman Digital Arts Ltd. v. City and County of San Francisco* (2020) 59 Cal.App.5th 317, 326, fn. 6, quoting *Dyanlyn Two v. County of Orange* (2015) 234 Cal.App.4th 800, 811.)

As the Board has explained, "Annotations are primarily summaries of the conclusions reached in selected legal rulings of counsel. 'Legal rulings of counsel' means a legal opinion written and signed by the Chief Counsel or an

Property Tax Annotation,

<https://www.boe.ca.gov/lawguides/property/current/ptlg/annt/880-0641.html> [as of May 31, 2023].)

The City and County direct our attention specifically to Government Code section 7510, which states in pertinent part: "An investment by a state public retirement system in a legal entity that invests assets in real property and improvements thereon shall not constitute an investment by the state public retirement system of assets in real property and improvements thereon. For purposes of this paragraph, 'legal entity' includes, but is not limited to, partnership, joint venture, corporation, trust, or association. When a state public retirement system invests in a legal entity, the state public retirement system shall be deemed to be a person for the purpose of determining a change in ownership under Section 64 of the Revenue and Taxation Code." (Gov. Code, § 7510, subd. (b)(3).)

As the court explained in *California State Teachers' Retirement System v. County of Los Angeles* (2013) 216 Cal.App.4th 41 (*Teachers' Retirement*

_____

attorney who is the Chief Counsel's designee, addressing a specific tax application inquiry from a taxpayer or taxpayer representative, a local government, or Board of Equalization staff. [¶] Property Taxes annotations are a research tool to locate selected legal rulings of counsel. Annotations are intended to provide guidance regarding the interpretation of statutes and Board rules as applied to specific factual situations. They do not have the force or effect of law. Although annotations are synopses of past advice provided by the Board's legal staff, the advice is not binding and may be revised at any time. The date appearing at the end of an annotation reflects the agency's interpretation of statutes existing as of that date. In any instance where there is an inconsistency between the statute and an annotation, statutory law is controlling." (California State Board of Equalization, Applicability of Annotations and Source Documents <https://www.boe.ca.gov/lawguides/property/current/ptlg/annt/property-tax-annotations.htm [as of May 31, 2023]>.)

*System*), this statute was enacted in 1982 when CalSTRS was statutorily authorized "to invest a portion of its assets in real estate, so as to broaden [Cal]STR[S]'s investment opportunities on behalf of its members and retirees." (*Id.* at p. 57.) The Legislature recognized, however, that since property owned by CalSTRS is constitutionally exempt from property taxation, its purchases would negatively affect the local tax base. (*Ibid.*) The Legislature therefore required CalSTRS "to reimburse local governments by way of an 'in lieu' fee, so as to offset the local governments' loss of property tax revenues resulting from such investments." (*Ibid.*)

In 1991, the Attorney General opined the " 'in lieu' " fee was unconstitutional because it was effectively an ad valorem tax on property owned by CalSTRS. (*Teachers' Retirement System, supra,* 216 Cal.App.4th at p. 58.) In light of this opinion, CalSTRS commenced a number of lawsuits to recoup the fees it had paid. To resolve this litigation, the Legislature amended former section 7510 in 1992 to abolish the " 'in-lieu fee and instead require that all leases include a provision which would directly pass the full property tax onto the lessee.' (Governor's Office of Planning & Research, Enrolled Bill Rep. on Sen. Bill 1687, Sept. 2, 1992, p. 1.) Thus, the Legislature decided to shift the entire property tax burden to the lessee, even though the lessee merely held a possessory interest in the property." (*Ibid.*) Even at the time this amendment was moving through the Legislature there was considerable concern the new methodology did not cure the constitutional problem, and CalSTRS eventually challenged it in court. (*Id.* at p. 59.) CalSTRS lost in the trial court but prevailed on appeal, the Court of Appeal agreeing that the new methodology impermissibly taxed lessees for more than the value of their leaseholds and effectively continued to be an unconstitutional tax on CalSTRS's property. (*Id.* at pp. 60–64.) The

25

Legislature subsequently amended the statute to eliminate the offending provisions.  (Gov. Code, § 7510, subd. (b)(1), Stats. 2015, ch. 454, § 1.)

The statutory provision pertinent here is that stating "An investment by a state public retirement system in a *legal entity that invests assets in real property* and improvements thereon shall not constitute an investment by the state public retirement system of assets in real property. . . .  For purposes of this paragraph, 'legal entity' includes, *but is not limited to*, partnership, joint venture, corporation, trust, or association."  (Gov. Code, § 7510, subd. (b)(3), italics added.)  This provision was added to the statute as part of the 1992 amendments at the request of the Board of Equalization.  (State Board of Equalization, Legislative Bill Analysis on Sen. Bill No. 1687 (1991–1992 Reg. Sess.) amended June 15, 1992, p. 3.[14])  The Board urged that the term " 'investment' " be "clarified to mean the acquisition of stock or other ownership interest in a legal entity as an investment to differentiate between that term, as it is used in Section 64 of the Revenue and Taxation Code, and an investment in real property."  (*Ibid.*; Assem. Com. on Rev. & Tax., Sen. Bill No. 1687 (1991–1992 Reg. Sess.) amended June 26, 1992, p. 3 [Board requested "[t]he term 'investment' [] be clarified to distinguish between entity ownership interest in a business and an investment in real property"].)  It further urged that the clarifying language "should use language parallel to that of Section 64, using 'corporation, partnership, or other legal entity" in order to maintain consistency between the sections.  (State Board of Equalization, *supra*, amended June 15, 1992, p. 3.)  Thus, the purpose of the additional language was to reinforce the distinction between direct ownership

---

[14] We take judicial notice of this legislative history on our own motion. (Evid. Code, §§ 452, subds. (a), (c), 459.)

26

of real property and ownership of an interest in an entity owning real property. Moreover, this was done in the context of trying to ameliorate the loss of local property tax revenue arising from the purchase of income producing properties by the state's pension plans. (Sen. Rules Com., Sen. Bill No. 1687 (1991–1992 Reg. Sess.) amended June 26, 1992, p. 3 ["The revisions proposed by Senate Bill 1687 will conform to the legislative intent of Section 7510 by protecting local agencies from revenue losses associated with PERS investment in real property."].)

In a 2010 annotation, the Board of Equalization relied in part on this provision in considering whether property purchased by a limited partnership in which CalSTRS held a two-thirds interest and subsequently held a one hundred percent interest which it converted to an LLC, was exempt from property taxation. There was "no dispute," said the Board, "that property directly owned by CalSTRS is property owned by the state" and thus constitutionally exempt from property taxation. (California State Board of Equalization, Property Tax Annotation 735.0009, Retirement Systems (Public) Property, p. 2 <https://www.boe.ca.gov/lawguides/property/current/ptlg/annt/735-0009.html [as of May 30, 2023]>.) The Board concluded, however, that ownership of an LLC that owns real property is not equivalent to direct ownership of the property. It first cited to the general statutory provisions governing LLCs, stating Corporations Code "section 17300 specifically states that members of a limited liability company hold no direct ownership interest in an LLC's assets, and as such, ownership of such interests is not simply a method of holding title tantamount to direct ownership. The Legal Department has also opined that for property tax purposes, an LLC is a separate and distinct entity from its sole member. Thus, although limited liability companies may

27

be treated as a disregarded entity and 'looked through' for income tax purposes, such is not the case for California property tax purposes." (California State Board of Equalization, Property Tax Annotation 735.0009, at p. 3, fn. omitted.) "[A] member of a limited liability company does not hold any interest in the real property owned by the limited liability company. Once members contribute assets to an LLC, those assets become assets of the LLC and the members lose any direct ownership interest they had in the assets." (*Id.* at p. 2, fns. omitted.)

The Board cited secondly to Government Code section 7510, subdivision (b)(3). "That section provides specifically that investment by a state public retirement system in a legal entity that invests assets in real property and improvements is not an investment by the state public retirement system of assets in the real property and improvements themselves." (California State Board of Equalization, Property Tax Annotation 735.0009, Retirement Systems (Public) Property, *supra*, at pp. 3–4.) The Board expressly rejected the assertion Government Code section 7510 is "meant to address partial ownership" and not "wholly owned legal entities" as "not supported by the plain language of the statute." (California State Board of Equalization, Property Tax Annotation 735.0009, at p. 4.) "If the legislature did not intend for this subdivision to apply to wholly owned legal entities, the legislature could have so provided." (*Ibid.*)

In the more than a decade that has ensued since the Board of Equalization's opinion, the Legislature has taken no action to alter the propositions therein articulated.[15] (See *Towner, supra,* 63 Cal.App.5th at p. 773.)

_____

[15] At least one other jurisdiction has taken the same view as the Board of Equalization. (See *Middlesex Retirement System, LLC v. Board of*

Given these legislative and administrative pronouncements acknowledging that government entities can be members, and even the sole member, of an LLC and reinforcing the separateness of LLCs from its members, and even a sole member, we conclude these propositions reasonably extend to the documentary transfer tax context. This also comports with the Legislature's concern that cities and counties not lose tax revenue they would otherwise derive from a private sale of an investment property, when the property is procured by a tax-exempt public retirement system. Government Code section 7510 resolves this problem with respect to the loss of property tax revenue through the taxation of lessees' personal property interests. That, of course, is not a strategy that can be employed to recoup a lost documentary transfer tax. This loss is mitigated, however, by acknowledging the separateness of an LLC or any other legal entity through which a public retirement system acquires the property.

The Legislature could, of course, enact legislation providing that such separateness be overlooked in the context of documentary transfer taxes, just as the LLC statutes provide with respect to income taxation. And as we have observed, there is some tension between the statutory mandate to CalSTRS to achieve the highest return responsibly possible on the retirement funds it manages, and the exaction of transfer taxes when CalSTRS creates an LLP of which it is a sole member to purchase an investment property rather than

---

*Assessors of Billerica* (Mass. 2009) 453 Mass. 495, 500 [rejecting argument that LLC whose sole member was a government retirement system was exempt from paying state property tax; "the property here is not owned by a regional retirement system but by LLC, which is not an instrumentality of government, and the [property] taxes were properly assessed to LLC, as owner"].)

purchasing the property itself.  However, reconciling these varying concerns and objectives is a matter that remains with the Legislature.

## DISPOSITION

The judgment is affirmed.  Costs on appeal to respondent.

_____

Banke, J.


We concur:


_____

Margulies, Acting P.J.


_____

Swope, J.*


**\*Judge of the San Mateo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.


A163369, CSHV 1999 Harrison v. County of Alameda

Trial Court: Alameda County Superior Court

Trial Judge:       Hon. Frank Roesch

Counsel:

Greenberg Traurig LLP, Bradly Randolph Marsh, Brian Quinn Hall and Colin W. Fraser for Plaintiffs and Appellants.

Office of the Alameda County Counsel, Farand Kan; Office of the City Attorney, Maria S. Bee; Jarvis Fay LLP, Benjamin Peters Fay, Gabriel James McWhirter, Carolyn C. Liu for Defendants and Respondents.


Colantuono, Highsmith & Whatley, PC, Ryan Thomas Dunn as Amicus Curiae on behalf of Respondent.